TRACY L. WILKISON
Acting United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
GREGORY W. STAPLES (Cal. Bar No. 155505)
BENJAMIN D. LICHTMAN (Cal. Bar No. 241135)
BRADLEY E. MARRETT (Cal. Bar No. 288079)
Assistant United States Attorneys
        Ronald Reagan Federal Bldg. & U.S. Courthouse
        411 West 4th Street, Suite 8000
        Santa Ana, California 92701
        Telephone: (714) 338-3535/3505
        Facsimile: (714) 338-3708/3561
        E-mail:    greg.staples@usdoj.gov
                   benjamin.lichtman@usdoj.gov
                   bradley.marrett@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 16-00076-JVS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT GILBERT N. MICHAELS |
| v. | |
| GILBERT N. MICHAELS, et al., | Date: August 23, 2021 |
| Defendants. | Time: 9:00 a.m. |

    The government submits its sentencing position for defendant
Gilbert N. Michaels.

Dated: August 4, 2021                    /s/
                                    GREGORY W. STAPLES
                                    BENJAMIN D. LICHTMAN
                                    BRADLEY E. MARRETT
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

1

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    INTRODUCTION...................................................1

II.   BACKGROUND.....................................................1

III.  GUIDELINES CALCULATIONS........................................2

      A.    Applicable Sentencing Guidelines........................3

      B.    Government's Loss Calculation...........................4

      C.    Number of Victims.......................................8

      D.    Violation of Prior Judicial Order.......................8

      E.    Money Laundering.......................................10

      F.    Leadership Role........................................10

      G.    Alternative Analysis Under U.S.S.G. § 2S1.1(a)(2).......11

IV.   CRIMINAL HISTORY CATEGORY CALCULATION.........................11

V.    SECTION 3553 FACTORS..........................................12

VI.   FINE 14

VII.  THE COURT SHOULD REJECT DEFENDANT'S ATTEMPTS TO RELITIGATE
      THE TRIAL BY STRIKING THE DECLARATIONS OF SNODGRASS AND
      JOHNS.........................................................14

VIII.     DEFENDANT'S OBJECTIONS TO CERTAIN FINDINGS IN THE PSR
      EITHER IGNORE THE EVIDENCE IN THIS CASE OR ARE IRRELEVANT
      TO SENTENCING.................................................16

      A.    Pricing and the Fact Most Businesses Received Toner at
            No Extra Charge as Part of Service Agreements on
            Office Machines........................................16

      B.    The Use of Fax Confirmation Forms and Service
            Agreements Were in Furtherance of the Scheme...........18

      C.    Defendant Was Not In Compliance With the FTC Order,
            and the Issue is Irrelevant............................19

IX.   THE COURT SHOULD REMAND DEFENDANT FOLLOWING SENTENCING........20

X.    CONCLUSION....................................................21

i

**TABLE OF AUTHORITIES**

CASES:                                                              PAGE(s)

United States v. Armstead,
  552 F.3d 769 (9th Cir. 2008) ................................. 6-7

United States v. Miller,
  953 F.3d 1095 (9th Cir. 2020) ................................. 7

United States v. Riley,
  335 F.3d 919 (9th Cir. 2003) ................................. 7

United States v. Studley,
  47 F.3d 569 (2d Cir. 1995) ................................. 6

United States v. Treadwell,
  593 F.3d 990 (9th Cir. 2010) ................................. 7

United States v. Wells,
  804 Fed. Appx. 515 (9th Cir. 2020) ........................... 6

STATUTUES:

18 U.S.C. § 1341 ............................................. 1
18 U.S.C. § 1349 ............................................. 1
18 U.S.C. § 2326 ............................................. 3
18 U.S.C. § 3353 ............................................. 3
18 U.S.C. §§ 1957 ......................................... 1, 2

ii

## I.   INTRODUCTION

The government has no objections to the findings in the PSR, with the exception of the PSR's loss calculation.  The government provides an updated loss figure that does not affect the PSR's calculation of the offense level.  For the reasons discussed below, the government recommends a sentence of 120 months of imprisonment, a fine of $200,000 and three years of supervised release.  The government believes restitution is impractical in this case and therefore does not recommend an order for restitution.

## II.   BACKGROUND

After a six-week trial, the jury convicted defendant Michaels of Counts One, Three, Five, Seven, Nine, Eleven, Thirteen, Fourteen, Fifteen, Twenty, Twenty-Three, and Twenty-Six through Thirty of the Indictment, alleging conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, mail fraud, in violation of 18 U.S.C. § 1341, and money laundering, in violation of 18 U.S.C. §§ 1957 and 1957.

Michaels owned and operated IDC Servco and Mytel International (collectively, Michaels' companies) during the time of his counts of conviction.  These businesses were operated as a criminal enterprise. The entire purpose of the businesses was, with the assistance of boiler room operators, to fraudulently sell toner to businesses, charities, and other organizations throughout the United States.  As established at trial, Michaels' companies handled the billing and shipping of the toner.  Michaels' companies paid the cost of the toner, and they deducted that cost, as well as costs for returns, chargebacks, money held by Michaels' companies in reserve, and Michaels' companies' fee, from the proceeds of the sales they paid to

the sales companies.  See RT 11/1/19, 47: 6-13; 73: 1-12; see also Kikugawa Decl., ¶ 2.

The price that Michaels' companies charged the sales companies for the toner they shipped was at or above the retail price.  See RT 11/1/16: 75, 187.[1]  The prices charged to the victims in this case, many of whom were already receiving toner at no additional charge pursuant to contracts for their copiers and printers, was far above the retail price.  RT 11/8/19: 111-14;[2] see section VIII.A, infra.

Therefore, for purposes of a loss estimate, the money received by Michaels' companies and sent to the sales rooms is a conservative measure of loss to victims that excludes the retail cost of the toner shipped, though it does not count the fees Michaels charged.  The money the sales rooms received represents the cost of the toner above its retail value that victims were duped into paying.

## III. GUIDELINES CALCULATIONS

The government[3] calculates the Sentencing Guidelines as follows:

---

[1] The government's expert testified at trial that "[o]n some of these that ISC cost was above Lexmark's web price, and Lexmark's web price is – any of us could go on the web and buy a quantity of one cartridge at a price.  I think at least in some of these cases, the ISC cost is actually higher than that."  RT 11/8/19 at 113-114.

[2] Regarding the "max assign" price, the government's expert testified: "'That actually was the column that drew my attention the most.  When I compared that max assign price to the web price that I mentioned that Lexmark would put on their website so any of us could buy a quantity of one, that max assign price was four, five, six times higher, four to six times the price of the web price.  So in 32 years of my working in this industry, I have never seen supplies prices this high."  RT 11/8/19 at 114.  The government's expert was asked "In your opinion would that be a competitive price in the industry?"  His response was "No."  Id.

[3] The Probation Office did not have the government's loss estimates at the time the PSRs were filed.  The government produced the estimates to Probation and defense counsel on October 1, 2020, once it had determined a reasonable approach to the loss calculations in this case.

2

```
1      Base Offense Level:      7   U.S.S.G. § 2B1.1(a)(1)

2      Loss > $9,500,000:      20   U.S.S.G. § 2B1.1(b)(1)(K)

3      Mass Marketing:          2   U.S.S.G. § 2B1.1(b)(2)(A)(ii)[4]

4      Violation of Prior Order: 2  U.S.S.G. § 2B1.1(b)(9)(C)

5      Money Laundering:        2   U.S.S.G. § 2S1.1(b)(2)

6      Leadership Role:         4   U.S.S.G. § 3B1.1(a)

7      Total offense level:    37
```

8   Probation has determined that defendant is in criminal history

9   category II.  The resulting sentencing range for an offense level 37

10  and criminal history category II is 235-293 months.  In addition,

11  defendant is subject to an additional five years in prison because

12  the crime involved telemarketing.  18 U.S.C. § 2326.  Nevertheless,

13  for the reasons discussed below, the government believes a sentence

14  of 120 months satisfies the sentencing goals of 18 U.S.C. § 3353.

15      **A.   Applicable Sentencing Guidelines**

16      As noted in the PSR, the applicable guideline for the grouped

17  counts in this case is U.S.S.G. § 2S1.1 because of the money

18  laundering convictions.  (PSR ¶¶ 95-97.)  Pursuant to U.S.S.G.

19  § 2S1.1, the base offense level is calculated one of two ways,

20  either: (1) applying the offense level for the underlying offense

21  from which the laundered funds were derived (here, mail fraud and

22  conspiracy to commit mail fraud), if the offense level for that

23  offense can be determined; or (2) applying an offense level of 8 plus

---

26      [4] The PSR applies U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved more than ten victims.  (PSR ¶ 102.)  The government does not disagree that this section also applies.  Pursuant to the guidelines, the Court can only apply one of these two subdivisions, both of which provide for a 2-level enhancement.

3

1  the number of additional offense levels from § 2B1.1 corresponding to
2  the value of laundered funds.

3  For the reasons explained herein, the government believes that
4  the offense level for the underlying offense can be determined and,
5  therefore, the Court should apply U.S.S.G. § 2S1.1(a)(1).

6  **B.   Government's Loss Calculation**

7  The government's loss estimate for Michaels is $24,433,407.  <u>See</u>
8  Declaration of Carlene Kikugawa, attached herein, at ¶ 5.  This is
9  the amount of money paid by IDC to the sales rooms owned by all the
10 charged defendants in this case (both those who pleaded guilty and
11 those convicted at trial) from 2010 to 2014, the period for which the
12 government had bank records.  The government used this time period as
13 the basis for loss estimates for the defendants who pleaded guilty,
14 and is using the same basis for the trial defendants who have already
15 been sentenced, including defendants Milheiser and Scimeca.

16 The government believes this is a reasonable estimate of loss,
17 even though it undercounts the actual loss because it measures only
18 four years of a scheme that spanned decades.  Notably, this approach
19 considers the retail value of toner received by victims.  IDC paid
20 the sales rooms only the net from the sales after deducting the cost
21 of the toner (at retail rates or more), IDC's fees for shipping the
22 toner, and a holdback for a reserve against future returns for each
23 sales room.

24 Defendant is liable for the amounts paid to the sales rooms as
25 they were foreseeable losses that fell within the scope of the
26 conspiracy.  Under U.S.S.G. § 1B1.3, defendant is liable for all acts
27 and omissions of others that were

28

4

      (i)     Within the scope of the jointly undertaken criminal activity,

      (ii)    In furtherance of that criminal activity, and

      (iii)   Reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1)(B). Defendant is also liable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant." U.S.S.G. 1B1.3(a)(1)(A). The evidence at trial supports either theory.

The fraudulent sales made by the sales rooms were not just foreseeable, they were the entire goal of the conspiracy charged in this case. As shown at trial, defendant signed service agreements with the sales rooms which set forth the terms under which IDC would fulfill sales of toner by the sales rooms (in addition to guaranteeing their telemarketing bonds, which the owners could not otherwise have obtained). With respect to the foreseeability of loss, defendant set the prices at which the toner could be sold and provided price catalogs to the sales rooms. Defendant held periodic meetings at the Beverly Hills Country Club, which were deemed mandatory by sales room owners, where he exhorted the rooms to increase toner sales and told the owners that his settlement with the FTC provided them "cover." Defendant collected the money from the sales and paid the room owners only after his costs had been covered and reserves held back against future returns. Defendant advanced money to rooms to allow them to stay in business. Defendant also provided "dead files," or leads for businesses that had previously bought toner, that he obtained from one sales room to give to another

1    sales room.  See United States v. Studley, 47 F.3d 569, 576 (2d Cir.

2    1995)(factors considered in assessing scope of role in scheme include

3    whether defendant "helped design or develop the scam," "furthered the

4    objectives of the operation as a whole," "assisted others with their

5    sales," and received "profits from the overall operation" versus

6    "pure commission basis.").

7         Defendant did all this while his company received hundreds of

8    thousands of complaints from victims who repeated the same refrain:

9    they were led to believe they were dealing with their regular

10   supplier and that a price increase was imminent.  This happened

11   despite the language in the service agreements that was supposed to

12   prohibit that exact conduct.  The money taken in by the sales rooms,

13   a number of whose owners testified at trial that they could only make

14   sales by using the deceptive pitch, was clearly within the scope and

15   in furtherance of the conspiracy.  It was not just reasonably

16   foreseeable.  It was the entire point of the conspiracy as evidenced

17   by the service agreements.

18        The government believes this loss amount is established by clear

19   and convincing evidence over the course of the trial.  Nonetheless,

20   loss in this case must be established only by a preponderance of the

21   evidence.  "[C]lear and convincing evidence is not required when the

22   enhancements are based on the conduct of a conspiracy rather than

23   uncharged conduct."  United States v. Wells, 804 Fed. Appx. 515, 518

24   (9th Cir. 2020) citing United States v. Armstead, 552 F.3d 769, 777

25   (9th Cir. 2008)("Enhancements based on the extent of a conspiracy are

26   'on a fundamentally different plane than' enhancements based on

27

28
                                      6

1   uncharged conduct.")(quoting <u>United States v. Riley</u>, 335 F.3d 919,

2   926 (9th Cir. 2003)).

3        A reasonable estimate of loss is all the law requires.  "[T]o

4   comply with U.S.S.G. 1B1.3(a)(1)(B), a district court is not required

5   to proceed item-by-item through a complete list of all losses

6   attributed to a criminal conspiracy and to then make an

7   individualized determination whether or not each item was within the

8   scope of the defendant's 'joint undertaking' and was 'reasonably

9   foreseeable' to that defendant."  <u>United States v. Treadwell</u>, 593

10  F.3d 990, 1002-03 (9th Cir. 2010) rev'd on other grounds in <u>United</u>

11  <u>States v. Miller</u>, 953 F.3d 1095 (9th Cir. 2020).

12       Instead, when making its estimate of loss, a "district court

13  must consider 'available information . . . as appropriate and

14  practicable under the circumstances' including 'general factors, such

15  as the scope and duration of the offense and revenues generated by

16  similar operations.'"  <u>Treadwell</u>, 893 F.3d at 1003, citing U.S.S.G.

17  2B1.1, cmt n. 3.  "[A]ll that § 1B1.3 requires is that, in the

18  context of calculating the amount of loss under § 2B1.1, the district

19  court make factual determinations establishing the scope of each

20  defendant's joint undertaking and the amount of losses reasonably

21  foreseeable to each defendant."  <u>Id.</u>  "To require anything greater

22  would make criminal sentencing in cases like this [a 4-year, $40

23  million Ponzi scheme with 1,400 victims] unduly detailed, and given

24  our deferential review of the district court's estimate of the amount

25  of loss, would serve little purpose."  <u>Id.</u>

26       Defendant was the architect of a scheme that spanned 34 years,

27  and it involved thousands of victims and at least dozens of sales

28

                                        7

rooms over the decades.  As the "hub" of the conspiracy's "wheel,"
defendant was connected to every salesroom (the "spokes"), and
defendant depended on those salesrooms to make the sales that made
money for defendant and his employees.  The losses inflicted by the
sales rooms were reasonably foreseeable to defendant, and within the
scope and duration of the conspiracy that he led.

### C.   Number of Victims

Application of U.S.S.G. § 2B1.1(b)(2)(A)(i) is not disputed by
defendant Michaels.  The government agrees that the Court should
apply either this provision or U.S.S.G. § 2B1.1(b)(2)(A)(ii) (Mass
Marketing), but not both.

### D.   Violation of Prior Judicial Order

The government concurs with the PSR that application of U.S.S.G.
§ 2B1.1(b)(9)(C) is applicable in this case.  Defendant Michaels was
subject to no less than four court orders prohibiting the precise
conduct in this case.  (PSR ¶ 64-69.)  Among these orders was the
Stipulated Final Order and Judgment in Federal Trade Commission v.
Michaels, et al., No. CV 87-7259-JMI (C.D. Cal.).  In that order,
defendant Michaels was prohibited from, among other things,
"representing in any manner that any of them is, represents or is
affiliated with a consumer's regular or usual supplier of photocopier
or office supplies; with the manufacturer, seller, lessor or services
of a consumer's photocopier or office equipment . . . ," from making
"any reference to a price change, price increase, old or new price,
or price freeze," and from making "any reference . . . to a prior
notification or failure to notify the consumer of any fact, or
request to check or verify any information about the consumer or the

8

consumer's equipment."  These prohibitions applied not only to Michaels but to "all other persons or entities in active concert or participation" with Michaels.

Of course, as the jury found at trial, Michaels ignored this and other orders and acted in concert with the sales companies to defraud consumers.  Moreover, each of the consumers was defrauded precisely in the manner prohibited by the FTC Order: victims were led to believe they were dealing with their regular supplier; victims were lied to about price increases, changes in price, and price freezes; and victims were asked to check information about their equipment.[5]

This evidence plainly supports application of the sentencing enhancement in this case.  Further, while Michaels complains that he should not be held responsible for violations of the orders committed by sales company representatives because there was no proof at trial as to how Michaels' conduct violated any particular provision (Def. Pos. at 19), that assertion is simply untrue.  There was substantial testimony that Michaels encouraged co-conspirators to make misrepresentations, including the use of the false and misleading price increase pitch.  See, e.g., RT 11/14/19 62-65 (knowledge of misrepresentations); RT 11/6/19 at 107-108 (encouraging misrepresentations); RT 11/13/1 at 137 (encouraging misrepresentations).  Moreover, the jury found that Michaels aided and abetted the sales companies in each of the underlying mail fraud counts.  (Michaels Verdict, CR 966.)  The jury necessarily found,

---

[5] See, e.g., RT 11/13/19 at 120; RT 11/6/19 at 107; RT 11/7/19 at 98-99; RT 11/7/19 at 192-193, 197-198, 217-218; RT 11/8/19 at 80, 150; RT 11/15/19 at 116, 119, 126-127; 11/19/19 at 47; RT 11/13/19 at 106 (script prepared by Michaels); RT 11/7/19 at 167-72; RT 11/14/19 at 22; RT 11/5/19 at 10-12; RT 11/1/19 at 14; 11/6/19 at 90.

therefore, that Michaels acted with the intent to facilitate the mail fraud.  (Court's Instr. No. 36, CR 954 at 45-46.)

The findings by the jury that Michaels conspired with and aided and abetted the sales companies also required a finding that Michaels knew (or was deliberately ignorant that) the sales companies were committing fraud.  Not surprisingly, the FTC Order contemplated this scenario, stating that Michaels would "not [be] responsible for acts or omissions of any sales company *unless [defendant Michaels] knew or should have known of such acts or omissions*."  (Ex. 470 at 7.)

To be sure, Michaels tried to avoid detection of his fraud (and also evade enforcement of the FTC Order and other orders) by papering over the scheme with contracts that gave lip service to compliance with the various orders.  But the jury saw through this artifice and found Michaels guilty both of conspiracy to commit mail fraud and the underlying mail fraud counts.

In short, in light of the jury's verdict and evidence at trial, Michaels plainly violated the FTC order, and the Court should apply U.S.S.G. § 2B1.1(b)(9)(C) and increase the offense level by two levels.

**E.   Money Laundering**

Application of U.S.S.G. § 2S1.1(b)(2) is not disputed by defendant Michaels.  The government agrees that the Court should apply this provision.

**F.   Leadership Role**

Application of U.S.S.G. § 3B1.1(a) is not disputed by defendant Michaels.  The government agrees that the Court should apply this provision.

1

       **G.   Alternative Analysis Under U.S.S.G. § 2S1.1(a)(2)**

2
      As discussed above, because the offense level for the underlying

3
fraud offenses in this case can be calculated based on a reasonable

4
estimate of the loss, the Court should calculate the offense level by

5
applying U.S.S.G. § 2S1.1(a)(1).  However, should the Court determine

6
that the offense level cannot be calculated for the underlying

7
offenses, then defendant's guidelines would be calculated under

8
§ 2S1.1(a)(2) as follows: Base Offense Level 24 (8 + 16 for

9
laundering more than $1,500,00), +2 (Money Laundering), + 4

10
(Leadership Role), for a total offense level of 30.  An offense level

11
of 30 and criminal history category II yield a guidelines range of

12
108-135 months.  This range would be reduced to 97-121 months if the

13
Court determines defendant Michaels' criminal history category is

14
overstated.

15
      Notably, the § 2S1.1(a)(2) guideline does not contemplate an

16
enhancement for a violation of a prior judicial order or the number

17
of victims.  Thus, in fashioning an appropriate sentence using this

18
guideline, the government submits that these aggravating, but

19
unaccounted for, factors, combined with the uncalculated, significant

20
loss amount, would offset the mitigating factors that support the

21
USPO's recommended downward variance.  Accordingly, if the Court were

22
to apply this guideline, the government's recommended sentence would

23
remain the same: 120 months.

24
**IV.  CRIMINAL HISTORY CATEGORY CALCULATION**

25
      The PSR calculates defendant Michaels' criminal history category

26
as II.  (PSR ¶ 124.)  Both the USPO, in its recommendation letter,

27
and defendant Michaels, in his sentencing position, contend that

28

1   defendant Michaels' criminal history is overstated.  (CR 1316 at 6;

2   CR 1415 at 22.)  The government agrees with the USPO's analysis –

3   that defendant Michaels' criminal history category is II – and also

4   with the USPO and defendant Michaels' position that this overstates

5   defendant Michaels' criminal history.  Accordingly, the government

6   concurs that defendant Michaels should be sentenced based on a

7   criminal history category of I.

8       An offense level of 37 and criminal history category of I

9   results in an advisory guidelines range of 210-262 months.

10  **V.   SECTION 3553 FACTORS**

11       While fraud in the individual sale of toner may not seem

12   significant, in the aggregate its impact is a serious drain on the

13   resources of small businesses and non-profits that are targeted.  At

14   a March 2000 hearing of the Senate Committee on Small Businesses, the

15   committee chairman opened the session as follows:

16       Last fall this Committee commenced a series of hearings on

17       deceptive or unfair trade practices that are particularly

18       harmful to the small business community . . . This morning we

19       will address another scam targeting small businesses; the

20       fraudulent telemarketing of office supplies, particularly copier

21       and printer toner.  While the fraudulent telemarketing of toner

22       cartridges may at first glance seem to be "no big deal," I am

23       here to tell you that it is actually an extraordinarily

24       widespread problem, and to be this high on our agenda it has to

25       be.  The Committee has received estimates that this type of

26       fraud victimizes businesses up to $250 million per year.

27  See S. Hrg. 106-516, filed concurrently as Exhibit 1, at p. 3.

28

1    The chairman went on to describe how the fraud worked: the
2    telemarketers "will expressly or implicitly represent that they are
3    associated with the business' regular supplier," and that there has
4    been, or is about to be, a price increase for toner.  Id.  The
5    chairman referenced aggressive collection techniques and "reloading"
6    – jamming sales through to a willing buyer until the scam is
7    discovered – conduct identical to this case.  Id.

8    The nature and circumstances of the offense, and the history and
9    characteristics of the defendant, support a 120-month sentence.
10   Defendant created the scheme in this case in 1988 after settling with
11   the FTC over the exact same misrepresentations at issue here:
12   pretending to be the victim's regular supplier and a price increase.
13   Defendant simply outsourced the lies inherent in the scheme to
14   provide a fictitious "arm's length" to his connections to the sales
15   rooms.  As the testimony of every sales room owner at trial made
16   clear, defendant ran the scheme – a scheme that could succeed only by
17   deceiving the victims.

18   Given the way the defendant flouted the FTC judgment and others,
19   a 120-month sentence represents a just punishment, promotes respect
20   for the law, and may deter others inclined to defraud small
21   businesses and non-profits.  As a result of the convictions in this
22   case, the U.S. Attorney's Office has received a complaint concerning
23   a toner scam operating in this District.  For too long defendants
24   have acted with impunity in conducting their fraud, viewing civil
25   suits as merely a cost of doing business.

26   In mitigation, the government agrees with Probation that
27   defendant's age, health conditions, and charitable work merit a

28
                                    13

1  downward variance.  A 120-month sentence is "no greater than

2  necessary" to achieve the goals of § 3553 -- it actually undercounts

3  the true losses in this case.

4  **VI.   FINE**

5      The government concurs with the USPO that a fine of $200,000 is

6  appropriate in this case.  Defendant Michaels also urges the Court to

7  adopt this fine.

8  **VII.  THE COURT SHOULD REJECT DEFENDANT'S ATTEMPTS TO RELITIGATE THE
       TRIAL BY STRIKING THE DECLARATIONS OF SNODGRASS AND JOHNS**

9

10     In discussing the nature and circumstances of the offenses,

   defendant claims he is not relitigating the case.  (Def. Pos., CR

11 1415 at 5.)  Yet that is exactly what defendant tries to do.

12     Most notably, defendant filed two declarations from former

13 employees James Snodgrass and Edith Johns to try to impeach the trial

14 testimony of Jerry Feldman.  Defendant does not explain why he did

15 not call these witnesses at trial, as he called former IDC employees

16 Elizabeth Woolfe and Pam Tucker.  Defendant offers only that

17 "[w]itnesses who might have controverted Feldman <u>may</u> have been afraid

18 to testify since the government labelled virtually anyone who worked

19 with Michaels an 'unindicted co-conspirator.'"  (Def. Pos. at 5.)

20 Neither Snodgrass nor Johns make this claim, and defendant does not

21 claim they were frightened in any way.  Absent an explanation for why

22 defendant did not offer this testimony at trial – or at least raise

23 the issue with the Court and seek immunity or appointment of counsel

24 for them – the declarations should be stricken.  Their declarations

25 are an attempt to relitigate an issue at trial – the credibility of a

26 witness – by offering evidence known and available to defendant

27 during the trial.

28

                                    14

1       The declarations do not impeach Feldman in any event.  Defendant

2  does not point to single statement in Feldman's testimony that he

3  claims is false based on the Snodgrass and Johns declarations.  The

4  declarations merely state that Feldman never said anything to them

5  about the complaint rate being high.  Snodgrass Decl. ¶ 6; Johns

6  Decl. ¶ 6.  Feldman never testified that he did.  Neither Snodgrass

7  nor Johns identify anything that Feldman said on the stand as false.

8  Yet from these declarations, defendant posits that Feldman gave

9  "arguably false testimony."  (Def. Pos. at 5.)

10       This is plainly an effort to relitigate the case, and it has no

11  merit in any event.  The declarations should be stricken.

12       Defendant attempts to relitigate other issues raised at trial,

13  such as claim that Toshiba "enlisted" the government to indict

14  defendant and the complaint rate was only .2 percent.  (Def. Pos. at

15  6.)  That was not what the jury heard.  Regarding Toshiba, Detective

16  Kesler testified that he contacted Toshiba and other major printer

17  suppliers as part of his investigation, that he met with the company

18  on one or two occasions and received documents from them pursuant to

19  a search warrant.  RT 11/19/19 at 194-95, 210.  Detective Kesler

20  testified that he did not recall a single document coming into

21  evidence in the trial that he had received from Toshiba and that the

22  bulk of the documents came from IDC.  Id. at 234-35.  As to the

23  purported .2 per cent complaint rate, Feldman explained at trial that

24  IDC tracked only written complaints from law enforcement, such as

25  state attorneys general, the BBB, lawyers, or other third parties.

26  RT 11/19/19 at 61-62.  Feldman testified that the vast majority of

27  complaints came by telephone and were not tracked.  Id. at 62.

28

Feldman testified that during his time at IDC hundreds of thousands of complaints, written and telephonic, were received.  He further testified that the complaint rate was around "50%" and that there were "hundreds of thousands of consumers calling in or returning merchandise – a lot of complaints."  RT 11/12/19 at 171-173. Defendant had ample opportunity to cross-examine Feldman on these points or to call other witnesses to contradict him (such as Snodgrass or Johns), and he did not.  The jury's verdict indicates that the jury credited Feldman's testimony.  Defendant's effort to relitigate these points is irrelevant to sentencing and should be disregarded.

**VIII.   DEFENDANT'S OBJECTIONS TO CERTAIN FINDINGS IN THE PSR EITHER IGNORE THE EVIDENCE IN THIS CASE OR ARE IRRELEVANT TO SENTENCING**

Defendant's objections to some of the findings in the PSR are based on misstatements of the testimony and evidence, or are simply irrelevant.

**A.   Pricing and the Fact Most Businesses Received Toner at No Extra Charge as Part of Service Agreements on Office Machines**

Defendant objects to PSR ¶¶ 36 and 61 (Def. Pos. at 7-8), which state that many if not most victims received toner at no extra charge as part of their service contracts, and that defendant charged prices up to 500% or more of the retail price.  (Def. Pos. at  7.) Defendant claims there was no evidence of this at trial.  Defendant is wrong.

As to the prices, defendant's own price catalogs prove the point.  Attached as Exhibit 2 herein is a page from Exhibit 644, which was an IDC price catalog admitted at trial.  As established at

16

trial through the testimony of sales room owners, the column labeled "I.S.C. COST" was the price defendant charged the sales room for the toner he shipped, a price at or above the retail price from outlets such as Staples or Office Depot.  The "MAX ASSIGN" column was the maximum price defendant allowed the sales rooms to charge – a price which the testifying sales room owners said they virtually always used in order to make a profit.  The first row on the page lists a FAX-575 cartridge that defendant sold to the sale rooms for $23.70, yet the price set by defendant to charge victims was $349.00.  That price is more than ten times the retail price.  Defendant cannot credibly claim there is no evidence he charged prices as much as 500% about retail prices.

As to the fact that most businesses received toner as part of service contracts, the government's expert, who spent a career in the office supply industry, described the extremely competitive market for office supplies, and in a particular the pricing for supplies like toner, and said that businesses that sell or lease office machines will include toner as part of the service contract.  RT 11/8/19; 105-06.  The strongest evidence of the prevalence of service contracts providing toner at no added cost is the testimony of every sales room owner who said they could only make sale by using some version of the "identity pitch," that is, persuading the victim to believe the caller was from their regular supplier.  This would not be necessary if a significant number of businesses were not already receiving the toner as part of their service contracts.

The high prices and the fact that most businesses received toner via service contracts were alleged in the indictment, and were

central issues at a trial that produced guilty verdicts on all counts.  It is only now, however, that defendant proffers a declaration by a private investigator, Kevin Baker, to try to refute these points.  He offers no explanation for why such testimony was not presented at trial.  The Court should reject defendant's attempts to relitigate this case.  The Baker declaration, like the declarations of Snodgrass and Johns, should be stricken.

In any event, Mr. Baker is not an expert in the toner industry or toner pricing; Mr. Baker's role here is nothing more than an Internet sleuth tasked with finding the highest possible price toner is listed for online.  There is no evidence that anyone actually paid the prices Mr. Baker identifies.  Moreover, a simple Internet search reveals that the same toner is widely available for a retail price at or below the ISC cost.  Cherry-picking outlier prices listed on the Internet, but not shown to have been paid by consumers, is not reliable evidence, much less substantial evidence to controvert the expert testimony presented at trial by the government.

**B.   The Use of Fax Confirmation Forms and Service Agreements Were in Furtherance of the Scheme**

Defendant objects to PSR ¶¶ 59(c) and 63 because they state that fax confirmation forms and service agreements between IDC and the sales rooms were used in furtherance of the scheme.  (Def. Pos. at 7, 8.)  Defendant merely repeats arguments he made at trial that were rejected by the jury.  As sales room owners testified, the fax confirmation forms were used to pressure victims into paying by saying the victim signed a form that disclosed who the seller was (often in ambiguous terms that the sales room, invariably with a generic name, "might" not be the regular supplier) and to provide

18

cover in the event law enforcement or the BBB inquired.  The use of the fax forms to pressure customers into paying, and as cover if law enforcement or the BBB inquired, shows the forms were used to further the scheme.

The service agreements were plainly in furtherance of the scheme.  They established the connection between the sales rooms and IDC.  The agreements were a necessary ingredient to keeping the scheme alive, as they provided Michaels a paper shield in litigation with consumers and others.  Of course, as discussed above, the jury saw through this and recognized that the service agreements served only to give lip service to the FTC Order.  In reality, Michaels and each of the defendants knew that the service agreements were just a wink and a nod and that they were to go about business-as-usual selling toner through fraudulent pitches.

### C. Defendant Was Not In Compliance With the FTC Order, and the Issue is Irrelevant

Defendant requests that PSR ¶ 64, which notes the 1988 FTC order against defendant and his companies, be amended to reflect that defendant complied with the order.  (Def. Pos. at 9.)  Defendant makes this request despite his convictions for mail fraud in this case based on the identical allegations contained in the FTC compliant and for practices he was prohibited from continuing. Defendant also neglects to mention that a contempt motion was filed against him by the FTC prior to his charges in this case.  That motion is pending has been stayed pending the resolution of this case.  Federal Trade Commission v. Mytel International, Inc., et al., No. 87-07259 GHK(SSx), ECF 203.  Defendant's request to amend the PSR should be denied.

1    As argued above with respect to the enhancement for violating a

2  previous court order, defendant's convictions for conspiracy, mail

3  fraud, and money laundering firmly establish that he violated the FTC

4  order.[6]

5  **IX.   THE COURT SHOULD REMAND DEFENDANT FOLLOWING SENTENCING**

6    As this Court has previously found, defendant Michaels is, and

7  remains, a flight risk.  ECF 996.  This Court's finding was affirmed

8  by the Ninth Circuit.  ECF 1028.  True, defendant Michaels has been

9  on home confinement since the beginning of the COVID-19 pandemic and,

10 as far as the government is aware, has been compliant with the terms

11 of his release.

12   But the imposition of sentence in this case significantly

13 increases the incentive to defendant to flee – particularly in light

14 of the length of the sentence recommended by the government and the

15 USPO.  Moreover, defendant Michaels' assets have <u>increased</u> since the

16 Court last considered defendant Michaels' request for bail.  At the

17 time of defendant's post-conviction bail hearing, defendant asserted

18 that he had total assets of approximately $3-$4 million.  RT 12/19/19

19 at 16 (ECF 1001) ("Q: Are you telling me his net worth is $3.5

20 million? . . . A: Your Honor, our best information is that the assets

21 would be under $4 million.  We think it's closer to $3.6 million at

22 this time.  We think that's correct.").  The PSR discloses assets of

23 more than $6 million (not including approximately $4 million in

24 additional assets defendant Michaels asserts are uncollectable).

25 (PSR ¶¶ 157-168.)  That is nearly one-and-a-half times what defendant

26

27    [6] For the same reasons, defendant's request to amend PSR ¶¶ 65-
   69, which note the lawsuits against defendant from private parties,
   should be disregarded.  His claims of compliance are irrelevant to
28 his sentencing in this case.

20

Michaels previously represented to the Court.  Further notable is the fact that approximately $2.7 million of that includes investments in the New Zealand Land Fund and Uruguay Agricultural Land Fund. Defendant Michaels thus has both an incentive to flee and the means to do so.

But not only does defendant Michaels have an incentive to flee and the financial means, defendant Michaels also maintains significant contacts with individuals and entities in foreign jurisdictions through his charity work.  Although such charitable work is laudable, the numerous letters of support submitted by defendant Michaels' charitable partners highlights the fact that defendant Michaels has potential harbors of refuge in foreign jurisdictions if he chose to flee.

In sum, given defendant's incentive, means, and foreign connections, there is a real risk that defendant will flee if given the opportunity to do so.  The government therefore recommends that defendant Michaels be remanded to the custody of the U.S. Marshal at the time of sentencing.

**X.    CONCLUSION**

For the foregoing reasons, the Court should impose a sentence of 120 months, in addition to the other terms and conditions recommended by Probation.